IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

In re:

IH 1, Inc., *et al.*,

Debtors

---

GEORGE L. MILLER
Chapter 7 Trustee,

    Plaintiff,

v.

SUN CAPITAL PARTNERS, INC., *et al.*,

    Defendants.

C.A. No. 13-1996 (RGA)

**MEMORANDUM ORDER**

Before this Court is Defendants' Motion to Exclude the Report and Testimony of Plaintiff's Expert Alan A. Schachter (D.I. 24) and Defendants' Motion to Strike the Affidavit of Alan A. Schachter. (D.I. 43). Both are fully briefed. (D.I. 25, 28, 30, 44, 47, 48). This Court took testimony on the first issue. (D.I. 34). For the reasons stated below, the *Daubert* motion (D.I. 24) will be **GRANTED**, and the motion to strike (D.I. 43) will be **GRANTED**.

Following the hearing, the parties deposed Scott Williams in Chicago, Illinois. (D.I. 37). Both parties agreed that Mr. Williams' testimony was relevant to the matter at hand. (*Id.*). With the Court's permission, the parties submitted briefing related to Mr. Williams' relevance to Mr. Schachter's report and testimony. (D.I. 39, 41, 46).

1

Federal Rule of Evidence 702 states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Court of Appeals has explained:

Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003).[1]

The crux of the dispute is whether Plaintiff's expert Alan A. Schachter can reject management's contemporaneous assessment of Indalex's financial health, and instead rely on his own projections. (D.I. 25 at 6; D.I. 28 at 10-23).

---

[1] The Court of Appeals wrote under an earlier version of Rule 702, but the recent amendments to it were not intended to make any substantive changes.

"Delaware law clearly prefers valuations based on contemporaneously prepared management projections because management ordinarily has the best first-hand knowledge of a company's operations." *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004). Defendants argue that Plaintiff "must" use management projections (D.I. 41 at 5), but the case it cites for this proposition says only that they "are an appropriate starting point." *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, *7 (Del. Ch. Dec. 31, 2013) (rev. July 9, 2004), *aff'd in part, rev'd in part*, 884 A.2d 26 (Del. 2005). "When management projections are made in the ordinary course of business, they are generally deemed reliable. Experts who then vary from management forecasts should proffer legitimate reasons for such variance." *Id.* (internal citations omitted). As the *Cede* court noted, unlike management projections, "*post hoc*, litigation-driven forecasts have an 'untenably high' probability of containing 'hindsight bias and other cognitive distortions.'" *Id.* (internal citations omitted). The Third Circuit has said that "[b]ecause [contemporaneous] projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance. Among the relevant data are cash flow, net sales, gross profit margins, and net profits and losses." *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992).

One of the primary reasons that Mr. Schachter determined that the management projections were not reliable was his belief that they were not actually created by Indalex or management. (D.I. 28 at 7 n. 10; *Id.* at 11-13). At the hearing, Mr. Schachter explained:

> Q. [Defendants' Counsel] kept referring to these Indalex projections or management's projections. Do you remember that?
> 
> A. Yes.
> 
> Q. Do you know if these were done by Indalex?
> 
> A. I have no idea. I don't believe they were.
> 
> Q. Why don't you believe they were?

3

> A. Because in -- in reading the deposition of Mr. Schultz, he indicated to me that, or his deposition was such that their methodology was not sophisticated, and that a number of major adjustments had to be made for them to arrive at these numbers. So, though they may have gotten input from Indalex, in his deposition where you asked him, are these FTI's projections, and I think they said, yes.

(D.I. 34 at 85; *see also* D.I. 28 at 15 ("FTI actually created the Projections.")).

Mr. Williams, an employee of Indalex at the relevant time, provided deposition testimony that establishes unequivocally that he and other employees created the Indalex projections. (D.I. 41 at 6; *see, e.g.*, D.I. 42-3 at 55 ("Q. Sir, do you believe that the projections that you put together and sent to FTI in May of 22, 2007 were reasonable when they were made? A. Yes."). Mr. Williams also clearly stated that FTI did not develop the projections. (D.I. 42-3 at 48 ("Q. To your knowledge, did FTI contribute any assumptions to the projections that you were creating and that you eventually sent to them, sir? A. No.")). Thus, the undisputed facts are inconsistent with one of the reasons Mr. Schachter (and Plaintiff's counsel) cited for discrediting the projections. Mr. Williams' testimony supports Defendants' argument that Mr. Williams, along with others, created the Indalex projections following ordinary practices. (D.I. 41 at 6-7).

Plaintiff continues to make arguments that Mr. Schachter was correct in rejecting the Indalex projections because they did not reflect the company's financial condition in 2007. (D.I. 39 at 15). For example, Plaintiff points to operating profit assumptions that were eight times actual operating profit. (D.I. 39 at 15-16). Even so, the fact is that one of Mr. Schachter's primary reasons for discrediting management projections—that they were not created by management, Mr. Williams or others—is not true. Therefore, Mr. Schachter bases his opinions in part on a "fact" that is not one of the "facts of the case."

Methodology concerns also exist. Mr. Schachter relies on the IBISWorld report of March 28, 2007. (D.I. 29-25, pp. 16-17, ¶¶ 41-42, pp. 23-24, ¶¶ 68, 70(c), citing D.I. 26-6 &

4

26-7). Once Mr. Schachter rejected management's projections, there would be a question as to how one, in 2012, might make reasonable and reliable (as opposed to *post-hoc* litigation-driven) projections from the perspective of 2007 looking five years into the future. There were at least three more or less contemporaneous analyses that might have been candidates for consideration, at least based on what I heard at the *Daubert* hearing. There was a J.P. Morgan analysis of Indalex, dated April 24, 2007 (D.I. 31-14). (*See* D.I. 34 at 22-23). Whatever the other drawbacks of the J.P. Morgan analysis, its projections were only through the end of 2007. (D.I. 31-14 at 4-5). There appear to be multiple Goldman Sachs analyses of Indalex. One, used at the *Daubert* hearing, was dated January 16, 2007. (*See* D.I. 34 at 29-30). That report made projections for Indalex through the end of 2008. There was a report by IBISWorld, dated March 28, 2007, for the entire aluminum production and processing industry. (D.I. 26-6 & 26-7).

The cover of the IBISWorld report states, "IBISWorld makes no representation to any person [other than Mr. Schachter and other paying subscribers] with regard to the completeness or accuracy of the data or information contained herein." (D.I. 26-6 at 1). The report itself is 36 pages long. It is about an industry that it describes as firms that "engage in one or more of the processes involved in converting aluminum-bearing ore bauxite into products such as alumina (a semi-refined aluminum product), aluminum ingots and rolled or drawn aluminum products (including plate, sheet, foil and extrusions). The industry also includes firms that recover aluminum from scrap." (*Id.* at 3). Indalex's business was limited to aluminum extrusion. The report states that "aluminum extrusions" are 21% of the industry. (*Id.* at 7). IBISWorld provided no other aluminum extrusion industry specific information, and no Indalex specific information at all. The word Indalex does not appear in the report. In terms of the contents, the report provides what purports to be actual information about a variety of industry activities, with

5

some detailed information through 2005 and some less detailed but still purportedly factual detail for 2006. The part of interest for our purposes is the last three pages of the report, which have the title of "Outlook." There are tables of "revenues," "gross product growth," "aluminum production, trade and apparent consumption," and "aluminum prices," all for the time period 2006-2012. To the extent they are sourced, the source is "IBISWorld Estimates." The only written explanation is at a high level of generality, that is, "Industry performance . . . is expected to deteriorate during the outlook period. Prices are expected to weaken. . . . US aluminum production is expected to make only very modest gains in output and that subdued outlook, combined with weaker prices, will see industry performance weaken. . . . Real industry revenue is expected to contract at an average annual rate of nearly 7% during the outlook period." It is fairly clear from the three pages that the "outlook" is that production and "apparent consumption" is foreseen as being essentially stable, while prices are seen as dropping significantly. Both the "Revenue" table and the "Aluminum Prices" table show the 2012 figure as being 82% of the 2008 figure.

Mr. Schachter takes the IBISWorld percentages for revenue change (D.I. 26-7 at 17) and plugs them into his calculations (D.I. 29-25 at 83) without change. One might expect that he would also then take IBISWorld's volume changes (as a percentage) and plug them in without change, but he does not do this. Instead, where IBISWorld shows no decrease in volume, Mr. Schachter shows sales volume decreasing with the 2012 volume being 82% of the 2008 figure.

Mr. Schachter's reliance on the IBISWorld report does not comport with any understandable principled method. First, there is no explanation why the description of an industry that is not Indalex's industry is a sound basis for making projections about Indalex. Second, there is no basis for evaluating the methodology or reliability of IBISWorld in reaching

6

the conclusions it did reach. There is no evidence of what IBISWorld's success rate in making accurate projections is. Indeed, from the layout of the report, it does not appear that IBISWorld itself places much weight in its projections. There is also no evidence that any persons actually engaged in making management projections for a particular company would rely upon IBISWorld in anything approximating the use to which Mr. Schachter put it. Third, as a general matter, if a source of information were reliable, it requires some explanation why a person relying upon it would use its information in the selective fashion that Mr. Schachter does. In other words, if the "price" and "revenue" projections are accurate, and price times volume equals revenue, it is a mathematical principle (from second grade, if memory serves) that "volume" is therefore also accurate. Yet, Mr. Schachter takes a different tack. (D.I. 34 at 72 (Q: So we agree that the revenues are quantity times price, and you say the quantity is unreliable, but the revenues [are] reliable? A: Yes.")).

I do not think Plaintiff has shown any justification for using the IBISWorld "Outlook" tables as a basis for calculating valid projections for Indalex. I do not understand that Mr. Schachter used any coherent methodology to convert the IBISWorld aluminum industry revenue projections into Indalex volume of sales projections.[2]

There is a another methodological issue, which is, essentially, Mr. Schachter seems to pick numbers out of a hat. (At least, there is no explanation provided as to why the numbers are chosen.). For example, in "synthesizing" his income approach analysis and market approach

---

[2] As an aside, it strikes me that projecting demand for aluminum extrusion five years into the future in the best of circumstances is a speculative enterprise. However speculative that venture is, however, it would seem that projecting revenues, which depends not only on projected demand but also projected market prices, is one step further into fantasyland. While it strikes me that experts could opine on the assumptions and reasonableness of Indalex's management projections, it may be that it is impossible to recreate what reasonable projections would have been.

7

analysis, Mr. Schachter weighted the numbers by a ratio of three to one in favor of the "income approach" analysis. (D.I. 29-25, p. 28, ¶ 84). Is there a methodological basis for this? Mr. Schachter stated, in connection with the market approach, "Indalex compares very unfavorably with the [four comparable companies]. I therefore adjusted the median multiples by a 50% reduction." (*Id.*, ¶¶ 82-83). This appears to be a judgment call on his part, but there is no explanation as to why this is an appropriate judgment.

Defendants call a ninety-one paragraph supplemental affidavit of Mr. Schachter a supplemental expert report, and argue that it should be struck. (D.I. 44 at 5; D.I. 40). This affidavit, submitted on December 29, 2014, was filed after the deposition of Mr. Williams, on November 24, 2014. At the hearing, Plaintiff's counsel suggested that Defendants had not been entirely forthcoming with offering Mr. Williams' knowledge about the development of the projections. (D.I. 34 at 100 ("Two of the defendants revealed Mr. Williams as a potential person with knowledge, and they revealed him as someone who knows about the debtor and communications relating to the debtor. Nothing about the projections. Throughout the depositions I asked, who did the projections. ...")).[3]

This Court will strike Mr. Schachter's supplemental affidavit. (D.I. 40). Defendants argue that this report is unauthorized, prejudicial, and untimely. (D.I. 44 at 11). The report is unauthorized, but it is mostly prejudicial only if Mr. Schachter cannot be deposed on it, and if Defendants cannot respond to it. It is untimely but there are no further events scheduled in this case. Thus, untimeliness is not a great concern.

---

[3] Indeed, Defendants wanted to call Mr. Williams at the hearing, after notifying Plaintiff only one week prior. This Court did not allow that. (D.I. 34 at 101 ("But I don't really think -- this sort of hearing is the first time, particularly when [Plaintiff's counsel] is at least suggesting that maybe the disclosure was not entirely fulsome in regards to what Mr. Williams knows.")).

8

Thus, I will strike the supplemental affidavit (which does not, in any event, address the methodological concerns I have discussed).

I also note that Plaintiff's complaint makes serious accusations. It may not be fair to penalize Plaintiff when it appears that Plaintiff made some good faith effort to determine who developed the management projections. Plaintiff was only told specifically of Mr. Williams' knowledge on the eve of the *Daubert* hearing. Further, I am unclear what the impact of finding that Mr. Schachter cannot rely upon the IBISWorld report is upon the case. Thus, while I am granting Defendants' motion to exclude, I want to make clear that this is a narrow ruling, which is, essentially, that Mr. Schachter cannot rely upon the IBISWorld "outlook" section[4] as a basis for making projections relating to insolvency. To the extent his report uses other methodologies and data to reach the conclusions it contains, those portions are not excluded.[5]

I think Plaintiff should have an opportunity to submit a new report.[6] Defendants will have an opportunity to respond. The parties should meet and confer, and, within two weeks, propose a schedule for moving forward.

---

[4] I do not think that it is a coincidence that IBISWorld does not use the word "projections" to describe the numbers it uses in its "Outlook" section.

[5] The exclusion of the IBISWorld Outlook certainly impacts the "income approach" to the "balance sheet test," but I am not clear on the impact on the "market approach" to the "balance sheet test."

[6] By "new," I mean that if the report comes from Mr. Schachter, it should contain all his opinions without the need to review his prior reports, testimony, and affidavit. They should not be incorporated by reference. Or Plaintiff might choose some method of proving its case that does not involve Mr. Schachter.

9

In sum, for the above reasons, the *Daubert* motion (D.I. 24) will be **GRANTED**, and the motion to strike (D.I. 43) will be **GRANTED**.

Entered this 25 day of September, 2015.

                                                                              */s/ Richard G. Andrews*
                                                                              United States District Judge