IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GEORGE L. MILLER, Chapter 7 Trustee,

      Plaintiff,

    v.

SUN CAPITAL PARTNERS, INC., *et al.*,

      Defendants.

Civil Action No. 13-1996-RGA

## MEMORANDUM OPINION

Thaddeus J. Weaver, Esq., DILWORTH PAXSON LLP, Wilmington, DE; Maura Fay McIlvain, Esq. (argued), DILWORTH PAXSON LLP, Philadelphia, PA, attorneys for Plaintiff.

Elizabeth A. Sloan, Esq., BALLARD SPAHR LLP, Wilmington, DE; Larry K. Elliott, Esq., David F. Russey, Esq., COHEN & GRIGSBY, P.C., Pittsburgh, PA, attorneys for Defendants Stubbs, Lawlor, Krouse, Leder, Alger, Terry, Liff, McElwee, Kreilein, Skillen, Gillen, Finnigan, Nelson, Talarico, Indalex Co-Investment, LLC, and HIG Sun Partners, Inc.

Gregory W. Werkheiser, Esq., MORRIS NICHOLS ARSHT & TUNNELL, LLP, Wilmington, DE; John F. Hartmann, Esq., KIRKLAND & ELLIS LLP, Chicago, IL; Michael A. Duffy, Esq. (argued), BAKER & MCKENZIE LLP, Chicago, IL, attorneys for Defendants Sun Capital Partners, Inc., Sun Indalex, LLC, Sun Indalex Finance, LLC, Sun Capital Partners III QP, LP, Sun Capital Partners IV, LP, and Sun Capital Partners Management III, LP.

September 15, 2016

1

ANDREWS, U.S. DISTRICT JUDGE:

Presently before the Court are Plaintiff's Motion to Identify the Claims to Be Tried to the

Jury (D.I. 77) and Motion to Preclude Jorge Vazquez from Offering, at Trial, the Opinion Set

Forth in Paragraph 133(D) of His Expert Report and the Analysis Set Forth in Exhibit 27 of That

Report (D.I. 70) and Defendants' Motion to Exclude the Report and Testimony of Plaintiff's

Expert Yvette R. Austin Smith (D.I. 73). The motions have been fully briefed. (D.I. 71, 74, 78,

83, 86, 89, 95, 97, 98). The Court held a *Daubert* hearing and heard oral argument on the motion

to identify the claims on August 17, 2016 ("Tr."). Ms. Austin Smith testified at the hearing. For

the reasons stated below, the Court will deny Plaintiff's Motion to Preclude Jorge Vazquez from

Offering, at Trial, the Opinion Set Forth in Paragraph 133(D) of His Expert Report and the

Analysis Set Forth in Exhibit 27 of That Report (D.I. 70); grant Plaintiff's Motion to Identify the

Claims to Be Tried to the Jury (D.I. 77); and grant in part and deny in part Defendants' Motion

to Exclude the Report and Testimony of Plaintiff's Expert Yvette R. Austin Smith (D.I. 73). A

separate order consistent with this memorandum opinion follows.

## I. BACKGROUND

Beginning in 2005, the Sun Capital Defendants explored acquiring Indalex, a company

that produced aluminum extrusion products in the United States and Canada. (D.I. 83 at 7).[1]

Defendants maintain that the desirability of acquiring Indalex centered around the ownership of

an interest in Asia Aluminum Group ("AAG"), a Chinese aluminum extruder, by one of the

Indalex subsidiaries, Indalex Limited. (*Id.*; *see* D.I. 84-2 at 5–7; D.I. 84-3 at 3). The acquisition

was finalized on February 2, 2006, when Indalex Holding Corp. acquired all of the outstanding

---

[1] Citations to the docket are to C.A. No. 13-1996-RGA unless otherwise noted.

stock of Indalex Inc. and Indalex Limited from Honeywell International Inc. (D.I. 78 at 5). The

structure of the relevant entities after the acquisition is set forth below:[2]



Indalex Holding Corp. financed the acquisition of Indalex Inc. and Indalex Limited

through three sources: (1) Sun Capital private equity funds, (2) money drawn on a revolving

credit facility (the "Revolver"), and (3) proceeds from Indalex Holding Corp.'s issuance of

11½% second-priority secured notes (the "Notes"). (D.I. 78 at 5). The Revolver was governed

by a credit agreement (the "Credit Agreement") between a predecessor to Indalex Limited,

Indalex Holdings Finance, Inc., Indalex Holding Corp., and JP Morgan Chase Bank, N.A. (D.I.

84-7 at 2, 23; D.I. 2-1 at ¶ 112 & n.3). The Notes were governed by an indenture (the

"Indenture") that provided that Indalex was required to use the first $50 million of the proceeds

---

[2] This chart is taken from the report of Plaintiff's insolvency expert. (D.I. 75-1 at 11). The general structure depicted in this organizational chart is not in dispute. (*See* D.I. 74 at 8).

from any AAG-related sale and 25% of any proceeds above $50 million to redeem the Notes. (D.I. 84-6 at 2, 10). In conjunction with the acquisition, Indalex Holding Corp. also executed a Management Services Agreement ("MSA") with Sun Capital Partners Management III, LP. (D.I. 84-10 at 2–9). Pursuant to the MSA, Sun Capital Partners Management III, LP agreed to provide management and consulting services to Indalex Holding Corp. and its affiliates in exchange for an annual management fee, payable in quarterly installments, equal to the greater of $1 million or 2% of the EBITDA of Indalex Holding Corp. and its affiliates. (*Id.* at 2, 3).

Indalex Limited sold its interest in AAG on May 15, 2007. (D.I. 84-14 at 2–3). Just prior to completion of the sale, on May 14, 20017, Indalex Holdings Finance Inc. retained FTI Capital Advisors, LLC to analyze whether Indalex would be rendered insolvent if it paid its shareholders a "substantial" dividend from the proceeds of the sale. (D.I. 84-22 at 2–9). Indalex Holding Corp. and Indalex Holdings Finance, Inc. declared a dividend (the "Dividend") payable June 1, 2007 in the aggregate amount of $76.71 million, or $76.71 per share. (D.I. 85-6 at 3; D.I. 85-7 at 3). Through 2007 and 2008, Indalex faced weakening demand and increasing liquidity challenges; however, the parties disagree regarding the causes, timing, and extent of those difficulties. (*See* D.I. 78 at 8–9; D.I. 83 at 10–14).

On March 20, 2009, Indalex Holdings Finance, Inc., Indalex Holding Corp., Indalex Inc., Dolton Aluminum Company, Inc., and Caradon Lebanon, Inc. filed for protection under Chapter 11 of the Bankruptcy Code. (Bankr. No. 09-10982 D.I. 1; Bankr. No. 09-10983 D.I. 1; Bankr. No. 09-10984 D.I. 1; Bankr. No. 09-10985 D.I. 1; Bankr. No. 09-10986 D.I. 1). In October 2009, the bankruptcy proceedings were converted to Chapter 7 and Plaintiff was appointed Trustee for the five debtors. (Bankr. No. 09-10982 D.I. 702, 739). In July 2010, Plaintiff initiated the instant action in the bankruptcy court and, in December 2013, moved to withdraw

the reference so that the case could proceed to jury trial in this Court. (Bankr. No. 10-52279-

PJW D.I. 1; D.I. 1; D.I. 2-1). The Court granted Plaintiff's motion to withdraw the reference on

September 5, 2014. (D.I. 19). Plaintiff's complaint alleges eleven claims, including, among

others: (1) fraudulent transfer claims relating to the Dividend and to fees paid pursuant to the

MSA (Counts I and II); (2) preference claims related to fees paid pursuant to the MSA (Counts

III and IX); and (3) claims for breach of fiduciary duty and breach of the duty of loyalty (Counts

VII and VIII). (D.I. 2-1 at 32–51). A central issue in the case is the solvency of Indalex as of the

date of the Dividend. (*See* D.I. 80 at 2; D.I. 81 at 1 n.1). Plaintiff seeks a jury trial on Counts I,

II, III, VII, VIII, and IX. (D.I. 78 at 5; D.I. 95 at 5).

## II. LEGAL STANDARDS

### A. *Daubert* Motions

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony,

stating that:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if: (a) the expert's scientific, technical, or other
> specialized knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue; (b) the testimony is based
> on sufficient facts or data; (c) the testimony is the product of reliable
> principles and methods; and (d) the expert has reliably applied the
> principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony:
> qualification, reliability and fit.   Qualification refers to the
> requirement that the witness possess specialized expertise. We have
> interpreted this requirement liberally, holding that "a broad range of
> knowledge, skills, and training qualify an expert."   Secondly, the
> testimony must be reliable; it "must be based on the 'methods and
> procedures of science' rather than on 'subjective belief or
> unsupported speculation'; the expert must have 'good grounds' for
> his o[r] her belief.  In sum, *Daubert* holds that an inquiry into the

reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[3] The proponent of expert testimony must "demonstrate by a preponderance of evidence that the [expert's] opinions are reliable." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994).

## B. Jury Trial Claims

The Seventh Amendment to the United States Constitution guarantees that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved." U.S. CONST. amend. VII. The United States Supreme Court has interpreted "Suits at common law" to refer to "suits in which *legal* rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989) (quoting *Parsons v. Bedford*, 3 Pet. 433, 477 (1830)) (internal quotation marks omitted).

---

[3] The Court of Appeals wrote under an earlier version of Rule 702, but subsequent amendments to the rule were not intended to make any substantive change.

Whether a specific claim triggers a right to a jury trial under the Seventh Amendment depends on (1) the historical characterization of the cause of action and (2) the remedy sought. *Id.* at 42. "The second stage of this analysis is more important than the first." *Id.* In a bankruptcy proceeding, if the first two parts of the *Granfinanciera* test indicate that a party is entitled to a jury trial on a claim under the Seventh Amendment, the court must then consider whether Congress extinguished the jury trial right by assigning resolution of the claim to the bankruptcy court and, if it did, whether Congress had the power to do so. *See id.*

A court must, whenever possible, preserve a party's Seventh Amendment right to a jury trial. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 510 (1959). As a result, attempts to curtail a party's right to a jury trial must be "scrutinized with the utmost care," *id.* at 501 (internal quotation marks omitted), and should be rejected whenever legal rights and remedies are implicated. *Curtis v. Loether*, 415 U.S. 189, 194 (1974). Where legal and equitable claims are joined in one action, facts common to the claims must be adjudicated by a jury, even if the legal claims are characterized as incidental to the equitable claims. *Id.* at 196 n.11; *see also Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 550 (1990).

## III. ANALYSIS

### A. Motion to Identify Jury Trial Claims

#### 1. Count I

Plaintiff argues that he is entitled to a jury trial on his Count I fraudulent transfer claim. (D.I. 78 at 11; D.I. 95 at 6). Defendants do not dispute that Plaintiff's Count I fraudulent transfer claim is legal in nature and that Plaintiff seeks a legal remedy. (*See* D.I. 83 at 14–15); *Granfinanciera*, 492 U.S. at 48 (holding that claims for preferential transfers are legal rather than equitable). Thus, Defendants do not dispute that Count I satisfies the first two parts of the

7

*Granfinanciera* test. (*See id.*). Defendants maintain, however, that Plaintiff's jury trial right with respect to Count I has been extinguished either in its entirety or at least as to the five creditor-Defendants that have filed proofs of claim in the bankruptcy.[4] (D.I. 83 at 14–15).

The third part of the *Granfinanciera* test requires the court to consider whether the jury trial right has been extinguished by Congress's having assigned resolution of the claim to the bankruptcy court. 492 U.S. at 42. Where a cause of action against a creditor who has filed a proof of claim in bankruptcy "falls within the process of the allowance and disallowance of claims," Congress has permissibly withdrawn jurisdiction over that action by courts of law and the Seventh Amendment does not guarantee a right to jury trial. *Billing v. Ravin, Greenberg & Zackin, P.A.*, 22 F.3d 1242, 1247 (3d Cir. 1994). The Seventh Amendment right is extinguished where the cause of action falls within the allowance and disallowance of claims "because [the] claim has been converted from a legal one into an equitable dispute over a share of the estate." *Id.* at 1253; *see also Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1330 (2d Cir. 1993). A cause of action falls within the claims allowance process where "the resolution of the dispute in which a jury trial is sought [would] affect the allowance of the creditor's claim." *Germain*, 988 F.2d at 1327. A cause of action that "would augment the estate but which [would] have no effect on the allowance of a creditor's claim" is not part of the claims allowance process. *Id.* If there are some factual or legal determinations regarding the trustee's claims that would not be disposed of in passing on a creditor's proof of claim, the right to a jury trial is not lost by filing the proof of claim. *Stern v. Marshall*, 131 S. Ct. 2594, 2617 (2011).

---

[4] The Count I Defendants that have filed proofs of claim in the bankruptcy are: Sun Indalex, LLC, Krouse, Leder, Alger, and Talarico. (Bankr. No. 10-52279-PJW D.I. 169-2; Bankr. No. 10-52279-PJW D.I. 169-3; Bankr. No. 10-52279-PJW D.I. 169-6; Bankr. No. 10-52279-PJW D.I. 169-7; Bankr. No. 10-52279-PJW D.I. 169-8; Bankr. No. 10-52279-PJW D.I. 169-17).

Plaintiff is entitled to a jury trial on Count I with regard to all of the Count I Defendants. Plaintiff's jury trial right has not been extinguished with respect to the Defendants that did not file proofs of claim in the bankruptcy. *See Katchen v. Landy*, 382 U.S. 323, 327–28 (1966) (stating that if a creditor who had received a preference did not file a claim in the bankruptcy proceeding, the creditor could demand a jury trial of a preference action brought by a trustee), *cited in Granfinanciera*, 492 U.S. at 57–58. Plaintiff's jury trial right also has not been extinguished with respect to the Defendants that have filed proofs of claim in bankruptcy. Plaintiff's fraudulent transfer action is not "integral to the restructuring of [the] debtor-creditor relations" implicated in Sun Indalex, LLC's two proofs of claim. *Granfinanciera*, 492 U.S. at 58. Sun Indalex LLC's first proof of claim as a Notes holder (Bankr. No. 10-52279, D.I. 169-2) is the type of "hierarchically ordered claim[]" to a share of the bankruptcy res that the Supreme Court held to be independent of Plaintiff's fraudulent transfer claim. *See Granfinanciera*, 492 U.S. at 56. Sun Indalex, LLC's second proof of claim (Bankr. No. 10-52279, D.I. 169-3) would likewise not resolve Plaintiff's claim regarding the pre-petition Dividend, because it is a claim for post-petition administrative expenses. *See In re Oakwood Homes Corp.*, 378 B.R. 59, 69–70 (Bankr. D. Del. 2007) (holding that fiduciary duty claims were not part of the bankruptcy claims allowance process where the creditors' claims in bankruptcy arose from an engagement letter, while the trustee's fiduciary duty claims arose from a period prior to the engagement letter). The proofs of claim filed by Defendants Krouse, Leder, Alger, and Talarico claim rights to "indemnification, contribution, reimbursement or other payments . . . from the Debtors pursuant to applicable law, contract or otherwise arising in respect of or by reason of claims . . . that may be brought . . . against the Claimant by the Debtors . . . ." (Bankr. No. 10-52279-PJW D.I. 169-6 at 4–5; Bankr. No. 10-52279-PJW D.I. 169-7 at 4–5; Bankr. No. 10-52279-PJW D.I. 169-8 at 4–

5; Bankr. No. 10-52279-PJW D.I. 169-17 at 5–6). Resolution of the debtors' indemnification or

contribution obligations toward Defendants Krouse, Leder, Alger, and Talarico would not

resolve Trustee's claim for fraudulent transfers with respect to the Dividend because the

indemnification and contribution obligations are contingent on the underlying liability

determination. (*See* Bankr. No. 10-52279-PJW D.I. 169-6 at 4 (claiming that "[t]he Debtors are

indebted and obligated to the Claimant in a contingent and unliquidated amount" for

indemnification or contribution); Bankr. No. 10-52279-PJW D.I. 169-7 at 4 (same); Bankr. No.

10-52279-PJW D.I. 169-8 at 4 (same); Bankr. No. 10-52279-PJW D.I. 169-17 at 5 (same)).

Thus, resolution of the claims in bankruptcy of Defendants Krouse, Leder, Alger, and Talarico

would not resolve Plaintiff's Count I.

For the reasons stated above, Plaintiff is entitled to a jury trial on Count I with regard to

all of the Count I Defendants.

### 2. Counts II, III, and IX

Plaintiff argues that he is entitled to a jury trial on Counts II, III, and IX. (D.I. 78 at 11;

D.I. 95 at 7–10). Defendants do not dispute that the causes of action alleged in Counts II, III,

and IX would ordinarily give rise to a jury trial right. (*See* D.I. 83 at 15–17). Defendants argue,

however, that Indalex expressly waived its right to a jury trial on Counts II, III, and IX in the

MSA. (*Id.*).

Because "the right of jury trial is fundamental, courts indulge every reasonable

presumption against waiver." *Aetna Ins. Co. v. Kennedy to Use of Bogash*, 301 U.S. 389, 393

(1937). Still, a litigant may waive the right to a jury trial in a civil case. To be enforceable, the

waiver must be knowing and voluntary. *See Brookhart v. Janis*, 384 U.S. 1, 4 (1966); *Tracinda

Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 222 (3d Cir. 2007). A contractual waiver is

10

knowing and voluntary when the facts of the case show that "(1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous." *First Union Nat'l Bank v. United States*, 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001), *cited in Tracinda Corp.*, 502 F.3d at 222. "[T]he burden of proving that a waiver was done both knowingly and intelligently falls upon the party seeking enforcement of a waiver of a jury trial clause." *Id.*

"In general, a contractual waiver binds only the parties who sign the contract." *Medical Air Tech. Corp. v. Marwan Inv. Inc.*, 303 F.3d 11, 18 (1st Cir. 2002); *In re Oakwood Homes Corp.*, 378 B.R. at 71. The MSA supports application of that general principle here because it expressly states that the jury trial waiver applies "to each party hereto" and that "[a]ll covenants, promises and agreements" in the MSA "shall be binding upon and shall inure to the benefit of the parties hereto." (D.I. 84-10 at 6). The MSA was entered into by Sun Capital Partners Management III, LP and Indalex Holding Corp.[5] (*Id.* at 8). Four of the five debtors, Indalex Holdings Finance, Inc., Indalex Inc., Caradon Lebanon, Inc., and Dolton Aluminum Company, Inc., are not parties to the MSA and therefore did not purport to waive their jury trial rights. (D.I. 2-1 at ¶ 12; D.I. 84-10 at 8–9). Additionally, with the exception of Sun Capital Partners Management III, LP, Defendants are not parties to the MSA and therefore face additional hurdles to claim rights under it. (D.I. 2-1 at 34, 35, 48); *see Medical Air Tech. Corp.*, 303 F.3d at 19 ("In cases such as this, where the jury waiver was part of a separate contract, signed only by certain parties to the larger transaction, non-signatory parties seeking enforcement of the waiver may

---

[5] Indalex Limited was also a party to the MSA but is not a party to this litigation. (*See* D.I. 84-10 at 9).

have a more difficult task in showing that the waiver was voluntary and knowing."). There is no basis to find a waiver of the right to jury trial as between the non-parties to the MSA.

With respect to Indalex Holding Corp., a party to the MSA, there is also no waiver of the jury trial right. The waiver provision in the MSA is set off in a short paragraph in all capital letters on the fifth page of a six-page agreement. (D.I. 84-10 at 6). The waiver provision is therefore conspicuous. *See First Union Nat'l Bank*, 164 F. Supp. 2d at 665 (finding a waiver conspicuous where it "was written in its entirety in all capital letters under the underlined heading 'Waiver of Jury Trial'"); *cf. Nat'l Equip. Rental, Ltd. v. Hendrix*, 565 F.2d 255, 258 (2d Cir. 1977) (affirming grant of jury trial where "[t]he waiver clause was set deeply and inconspicuously in the contract"). Additionally, there is no dispute that the parties are sophisticated business entities. Nevertheless, I conclude that the waiver was not knowing and voluntary for several reasons. First, Defendants did not meet their burden to prove that there was no disparity in bargaining power that foreclosed the possibility of negotiation. *See In re Oakwood Homes Corp.*, 378 B.R. at 72. The MSA was a standard document that Sun Capital Partners puts in place in its acquisitions. (D.I. 96-2 at 3–4 ("We put in place a management services agreement in every single platform acquisition that we do for Sun Capital Partners. It's a part of the private equity business model.")); *see Dreiling v. Peugeot Motors of Am., Inc.*, 539 F. Supp. 402, 403 (D. Colo. 1982) (holding that plaintiffs did not waive jury trial right in part because waiver clause was "on the twentieth page of a twenty-two page standardized form contract"). The evidence suggests that the MSA was not subject to negotiation by Indalex. (D.I. 96-3 at 3 ("A: [T]he Management Services Agreement is part of the original setup of Indalex. . . . Q: And in your experience where the lawyers for the buyer present the document or prepare the document as part of the closing, does the acquired company have any choice? . . . A: In my

12

experience as a practical matter that's part of the—part of the arrangement going forward.")); *see Dreiling*, 539 F. Supp. at 403 ("[T]he defendants have failed to show that the plaintiffs had any choice other than to accept the contract as written."); *First Union Nat'l Bank*, 164 F. Supp. 2d at 665 (denying motion to strike jury trial request because the court could not "find any evidence that there was not a gross disparity in bargaining power between [the parties]. . . . Indeed, given [the party seeking a jury trial's] financial straits at the time the documents were executed, it is highly likely that there was a severe disparity in bargaining power."). That Indalex Holding Corp. did not achieve favorable terms in the MSA further suggests that the MSA was not the subject of negotiation. (*See* D.I. 84-10 at 2–3 (providing that Sun Capital Partners Management III, LP would provide management services to Indalex Holding Corp. at its option, while Indalex Holding Corp. was obligated to pay management fees regardless of whether Sun Capital Partners Management III, LP provided the services)). Second, even if the MSA had been subject to negotiation by Indalex, the circumstances demonstrate that the waiver would not have been knowing and voluntary because it was executed on Indalex Holding Corp.'s behalf by an employee of Sun Capital. (D.I. 2-1 at ¶¶ 66–70; D.I. 84-10 at 8). The jury trial waiver as between Indalex Holding Corp. and Sun Capital Partners Management III, LP is not enforceable because it was not knowing and voluntary.

For the reasons stated above, Plaintiff is entitled to a jury trial on Counts II, III, and IX of the Complaint.

### 3. Counts VII and VIII

Counts VII and VIII of the Plaintiff's complaint are for breach of fiduciary duty and breach of the duty of loyalty, respectively. (D.I. 2-1 at 41, 45). The parties disagree regarding whether Plaintiff is entitled to a jury trial on Counts VII and VIII under *Granfinanciera*. (D.I. 78

at 10–13; D.I. 83 at 19–21; D.I. 95 at 10–12). The first step of the *Granfinanciera* analysis

requires the Court to determine whether Plaintiff's claims in Counts VII and VIII would have

been considered legal or equitable claims in 18th century English courts. 492 U.S. at 42–43.

"Actions for breach of fiduciary duty, historically speaking, are almost uniformly actions 'in

equity'—carrying with them no right to trial by jury." *In re Hechinger Inv. Co. of Del.*, 327 B.R.

537, 544 (D. Del. 2005) (internal quotation marks omitted); *see also In re Oakwood Homes*

*Corp.*, 378 B.R. at 66; *Damage Recovery Sys., Inc. v. Tucker*, 2005 WL 388597, at *2 (D. Del.

Feb. 2, 2005). The second step of the *Granfinanciera* analysis requires the Court to determine

whether the relief sought is legal or equitable. 492 U.S. at 42; *In re Oakwood Homes Corp.*, 378

B.R. at 67. Where there are both legal and equitable claims, and the relief sought is

compensatory money damages, plaintiff is entitled to a jury trial. *In re Oakwood Homes*, 378

B.R. at 68. Where there are only equitable claims and both legal and equitable relief is sought,

there is no jury trial right. *See Cantor v. Perelman*, 2006 WL 318666, at *7–9 (D. Del. Feb. 10,

2006).

      Here, four of the eleven counts of the Complaint (Counts I, II, III, IX) are undisputedly

legal in nature. (*See* D.I. 2-1 at 32, 34, 35, 48). Count I accounts for the bulk of the amount of

money in dispute in the case. (*See* D.I. 88 at 8–9). Counts VII and VIII, while equitable, seek a

legal rather than equitable remedy. Count VII summarizes the harm caused by the breach of

fiduciary duty as Indalex's loss of "the benefit of [certain] revenues" and that "Indalex's business

has been destroyed, Indalex was driven insolvent and the creditors' interests have been

impaired." (D.I. 2-1 at ¶¶ 250, 253). Count VIII summarizes the harm as, "Indalex's business

has been destroyed and the creditors' interests have been impaired." (*Id.* at ¶ 261). Counts VII

and VIII seek compensation for those harms. Additionally, the fact that the named Defendants

14

with respect to Counts VII and VIII do not coincide with the entities that received the challenged Dividend and management fees suggests that Plaintiff seeks compensatory money damages rather than equitable restitution. (*See id.* at ¶¶ 172, 178, 180; *Id.* at 41, 45).

"Ultimately, this Court must weigh the claims against the relief sought, with more weight on the latter, and determine if Plaintiff has [a] right to a jury trial." *In re Oakwood Homes Corp.*, 378 B.R. at 68. Weighing the equitable nature of the claims in Counts VII and VIII against the relief sought, which is legal, and bearing in mind the four other claims to which I have already concluded there is a jury trial right, I conclude that the balance weighs in favor of Plaintiff's right to a jury trial.[6]

For the reasons stated above, Plaintiff is entitled to a jury trial on Counts VII and VIII.

## B. *Daubert* Motions

### 1. Plaintiff's Motion to Preclude Certain Opinion and Analysis by Mr. Vazquez

Plaintiff moved to preclude Jorge Vazquez from offering at trial the opinion set forth in Paragraph 133(D) of his expert report and the analysis set forth in Exhibit 27 of his expert report on the ground that they contain certain errors that Mr. Vazquez has acknowledged. (D.I. 71 at 4, 9). At the hearing on these motions, the Court denied Plaintiff's motion (D.I. 70) on condition that Defendants provided Plaintiff with a corrected version of Exhibit 27. (Tr. at 138).

### 2. Defendants' Motion to Exclude the Report and Testimony of Ms. Austin Smith

Defendants seek to exclude the report and testimony of Plaintiff's solvency expert, Ms. Austin Smith, on the ground that her opinions suffer from several methodological flaws that render them unreliable. (D.I. 74 at 6–7). Ms. Austin Smith analyzed the solvency of Indalex using two methods: First, she analyzed the solvency of Indalex Holdings Finance, Inc. on a fully

---

[6] Defendants have not argued that the proofs of claim filed by some Defendants extinguish Plaintiff's jury trial right with respect to Counts VII and VIII under the third prong of *Granfinanciera*. (*See* D.I. 83 at 19–21 & n.90).

consolidated basis ("Indalex Consolidated"). (D.I. 75-1 at ¶ 13). Second, she analyzed the

solvency of Indalex Holdings Finance, Inc. on a partially consolidated basis ("Indalex U.S.

Entities), that is, excluding the foreign subsidiaries, namely, Indalex Limited and its wholly

owned subsidiaries ("Indalex U.S. Entities"). (*Id.*). Defendants argue that methodological flaws

undermine Ms. Austin Smith's solvency opinions pursuant to both methods. (D.I. 74 at 6–7).

     Regarding Ms. Austin Smith's opinions with respect to the solvency of Indalex

Consolidated, Defendants argue that Ms. Austin Smith improperly rejects management's

projections and that she fails to consider overwhelming market evidence that Indalex

Consolidated was solvent on the date of the Dividend.[7] (D.I. 74 at 17, 22). Although Ms. Austin

Smith did not consider each item of market evidence that Defendants point to (*see* D.I. 74 at 22–

23), she did consider contemporaneous market evidence in rendering her opinions. (*See* D.I. 75-1

at ¶¶ 26–34, 62–87; Tr. at 38–42, 103–17). She also explained her reasons for choosing not to

rely on some of the evidence to which Defendants point. (Tr. at 38–42, 103–17). Defendants'

argument that Ms. Austin Smith's opinions and testimony should be rejected because she

"ignored" overwhelming market evidence therefore fails. *Cf. In re Iridium Operating LLC*, 373

B.R. 283, 350 (Bankr. S.D.N.Y. 2007) ("Expert opinion is unreliable and not based on sufficient

facts and data when the expert made no attempt to reconcile his view with a number of real

---

[7] Defendants also briefly argue that Ms. Austin Smith's improper rejection of management's projections warrants exclusion because: (1) Ms. Austin Smith is not qualified to create projections because, prior to this litigation, she had never "created projections or a budget for an aluminum producer or extruder[,] analyzed the aluminum extrusion market or its unique aspects[,] or even reviewed research reports on that specialized market" (D.I. 74 at 18), and (2) Ms. Austin Smith's rejection of management's projections "ignores this Court's Order" (*id.*), which noted that "Delaware law clearly prefers valuations based on contemporaneously prepared management projections." (D.I. 53 at 3). In light of her extensive experience performing valuation and credit analysis, including her experience performing valuation and credit analyses of metal, manufacturing, and industrial companies, Ms. Austin Smith is qualified to testify about solvency in the aluminum extrusion industry. (*See* D.I. 75-1 at 63–65, Tr. at 112–14). The Court's order with regard to Mr. Schachter does not preclude Ms. Austin Smith's "downside scenario" analysis. (*See* D.I. 53 at 7 n.2 ("[I]t strikes me that experts could opine on the assumptions and reasonableness of management projections.")).

world events and fails to acknowledge and account for these events." (alteration and internal quotation marks omitted)). Further, I think that Ms. Austin Smith's use of a "downside scenario" to adjust management projections is methodologically sound and reliable. (*See* D.I. 75-1 at ¶¶ 60–87). Ms. Austin Smith's revisions to the management projections rely on a discrete set of explicit assumptions. (*See* D.I. 75-1 at ¶ 85). Ms. Austin Smith explained the reasons for adopting each assumption. (*See* D.I. 75-1 at ¶¶ 60–85; Tr. at 114–17). She also testified that the use of a downside scenario is an accepted method in her field. (Tr. at 30–31). Defendants' challenges to Ms. Austin Smith's selection and use of downside projections in her solvency analyses thus go to the weight, not the admissibility, of her opinions.

Defendants challenge Ms. Austin Smith's "guideline public company" and "precedent transaction" valuations of the Indalex U.S. Entities. (*See* Tr. at 83–93). Guideline public company and precedent transaction valuations are two standard valuation methodologies used in the balance sheet test of insolvency. (*See* D.I. 75-1 at ¶¶ 91, 93–95, 97; Tr. at 35–38); *In re Nellson Nutraceutical, Inc.*, 356 B.R. 364, 370 (D. Del. 2006). Pursuant to both valuation methodologies, the expert determines the enterprise value of a company by determining an appropriate metric of value and applying a multiple to that metric. (D.I. 75-1 at ¶¶ 93–95; Tr. at 35–38, 89–90). Ms. Austin Smith testified that the multiples she applied to value the Indalex U.S. Entities were the result of applying her judgment to the facts, in particular, that the Indalex U.S. Entities were "less profitable and w[ere] anticipated to grow at a slower rate than the comp companies that [were] referenced [in her report]." (Tr. at 85).

In both her guideline public company and precedent transaction valuations, Ms. Austin Smith selected valuation multiples for the Indalex U.S. Entities that were below the minimum valuation multiples of the selected comparable companies. (*See* D.I. 75-1 at ¶ 105, Exhibits 5,

7). Ms. Austin Smith testified that, although "another competent valuation professional may . . .

reach a different judgment than [she] did," the multiple would "be below the mean or the median

for sure." (Tr. at 129; *see also* Tr. at 130 ("I don't think another valuation professional would

reasonably approach the mean or the median here.")). Ms. Austin Smith elaborated further that

"there's a reasonable possibility" that another valuation analyst could "have used the minimum

instead of something below the minimum." (Tr. at 129). Ms. Austin Smith testified that she

would not be surprised if her calculations would have yielded positive equity values under both

the guideline public company and precedent transaction valuations if the selected multiples for

the Indalex U.S. Entities were increased by 0.01. (Tr. at 84–91).[8] The charts below, which

recount selected information from Exhibits 5 and 7 of Ms. Austin Smith's report, demonstrate

that if the selected multiples for the Indalex U.S. Entities were increased by 0.01, the Indalex

U.S. Entities' multiples would remain "around the minimum" and would not approach the mean

or median multiples. (Tr. at 130).

| Guideline Public Company Valuation | Indalex U.S. Entities Multiple | Minimum Multiple | Mean Multiple | Median Multiple |
|---|---|---|---|---|
| EV/LTM Total Revenues | 0.3 | 0.57 | 1.15 | 1.09 |
| EV/LTM EBITDA | 6.0 | 6.12 | 9.54 | 8.43 |
| **Precedent Transaction Valuation** | | | | |
| EV/LTM Total Revenues | 0.3 | 0.31 | 0.70 | 0.70 |
| EV/LTM EBITDA | 6.0 | 6.64 | 9.11 | 9.00 |

(*See* D.I. 75-1 at Exhibit 5, 7). Ms. Austin Smith thus has testified that reasonable valuation

professionals could have calculated equity values that would have led them to opine that the

---

[8] Ms. Austin Smith's conclusion in her report was that the equity value of Indalex U.S. Entities was negative $5,300,000. (D.I. 75-1 at ¶ 106).

Indalex U.S. Entities were solvent on June 1, 2007 under the balance sheet test using guideline public company and precedent transaction valuation methodologies. Ms. Austin Smith acknowledges that her selection of a valuation multiple over other, admittedly reasonable, multiples is based entirely on her own judgment. (*See* Tr. at 128). Ms. Austin Smith's solvency opinion, by relying entirely on "point estimate" valuation multiples, therefore imports a level of precision that she acknowledges cannot be achieved in this case by the methods she applies. (*See* D.I. 75-1 at ¶ 94 (stating that valuation multiples used in guideline public company and precedent transaction methodologies can be "range[s] or point estimates"); *cf. Fahmy v. Jay Z*, 2015 WL 5680299, *3-5 (C.D. Ca. Sept. 24, 2015) (the "use of precise percentage ranges to quantify the importance of factors [the expert] deems relevant does not appear to be supported by any objective methods of reliable calculation.")). Ms. Austin Smith's use of the balance sheet test to show that the Indalex U.S. Entities were just barely insolvent on June 1, 2007 is unreliable,[9] and is therefore excluded under Rule 702 and *Daubert*.

Ms. Austin Smith's insolvency opinion under the adequacy of capital test for the Indalex U.S. Entities incorporates the guideline public company and precedent transaction valuation analyses. (*See* D.I. 75-1 at ¶ 109). The reliability problems with Ms. Austin Smith's valuation multiples thus potentially infect her insolvency opinion under the adequacy of capital test. Explaining the effect that reasonable changes in the valuation multiples for the Indalex U.S. Entities would have on her solvency opinion under the adequacy of capital test, Ms. Austin Smith testified that:

> assum[ing] that a higher multiple is used and the result is that Indalex U.S. passes the balance sheet test[,] . . . I would turn to the adequacy of capital test. And so I

---

[9] Ms. Austin Smith notes, "The Discounted Cash Flow approach provides a direct measure of the intrinsic value of a company." (D.I. 75-1 at ¶ 105). For the Indalex U.S. Entities, she was not able to perform a discounted cash flow analysis. (*Id.* at ¶ 98). Thus, the entire basis for her opinion that Indalex U.S. Entities were insolvent was based on the guideline public company and precedent transaction methodologies.

would do for Indalex U.S. [Entities] the same thing that I did for Indalex
Consolidated, which is answer the question, how would this company perform
under a reasonable downside case? And I suspect that a more reasonable downside
case would be back to a negative equity value or negative equity cushion, and so
under that hypothetical, the Indalex U.S. entities would have passed the balance
sheet test but failed the adequate capital test, and so I'm then back at a conclusion
of insolvency.

(Tr. at 131). Speculation that the Indalex U.S. Entities would have been insolvent under the

adequacy of capital test even if the Indalex U.S. Entities were solvent under the balance sheet

test is insufficiently reliable to be admitted. *See Daubert*, 509 U.S. at 590. Thus, Ms. Austin

Smith's opinion that the Indalex U.S. Entities were insolvent on June 1, 2007 under the adequacy

of capital test is also excluded under Rule 702 and *Daubert*. (*See* D.I. 75-1 at ¶ 109).[10]

Defendants argue that the basis for Ms. Austin Smith's opinion regarding the solvency of

the partially consolidated Indalex U.S. Entities is an improper legal opinion. (D.I. 74 at 12, 14–

15; D.I. 98 at 6–7). Defendants maintain, further, that even if the deconsolidation of the Indalex

U.S. Entities were not a legal issue for the Court to decide, Ms. Austin Smith's deconsolidation

"disregards overwhelming evidence that the company operated as a single consolidated

economic unit." (D.I. 74 at 12–14; D.I. 98 at 6–10). I do not need to address whether Ms.

Austin Smith's opinions that the Indalex U.S. Entities were insolvent depend on improper legal

opinions or whether her deconsolidation methodology was reliable under the circumstances.

Each of Ms. Austin Smith's opinions regarding the insolvency of the partially consolidated

Indalex U.S. Entities is inadmissible because it relies on valuation multiples that I conclude are

unreliable. (*See supra* pp.17–20; D.I. 75-1 at ¶¶ 100, 101, 103–07, 109).

Plaintiff has met his burden to show that Ms. Austin Smith's use of "downside

projections" was sufficiently reliable to be admissible. Plaintiff has also demonstrated that Ms.

---

[10] Because Defendants did not raise the issue, I have not considered the admissibility of Ms. Austin Smith's
guideline public company and precedent transaction valuations of Indalex Consolidated. (*See* Tr. at 83–93).

Austin Smith's opinions and testimony should not be excluded on the ground that she ignored contemporaneous market evidence. Plaintiff has failed to meet his burden to prove, however, that Ms. Austin Smith's opinions regarding the insolvency of the Indalex U.S. Entities are reliable. Ms. Austin Smith is therefore precluded from offering testimony at trial regarding the insolvency of the Indalex U.S. Entities. Ms. Austin Smith is not precluded from testifying regarding the other analyses and opinions disclosed in her report.

## IV. CONCLUSION

For the reasons set forth above, the Court will deny Plaintiff's Motion to Preclude Jorge Vazquez from Offering, at Trial, the Opinion Set Forth in Paragraph 133(D) of His Expert Report and the Analysis Set Forth in Exhibit 27 of That Report (D.I. 70); grant Plaintiff's Motion to Identify the Claims to Be Tried to the Jury (D.I. 77); and grant in part and deny in part Defendants' Motion to Exclude the Report and Testimony of Plaintiff's Expert Yvette R. Austin Smith (D.I. 73). A separate order consistent with this memorandum opinion follows.

21